In the first two cases, if I can just ask counsel, it's the same counsel, similar issues. Are you prepared to just argue this case as one? I'll make sure that you have enough time to the extent that we need to differentiate between the two petitioners. But I think we can do that. In that case, the first cases that we'll hear will be Nababan v. Lynch and Rabowel v. Lynch. Counsel, you may approach. Good morning, Your Honors. May it please the Court, my name is David Hagigi. I am petitioner, excuse me, I am counsel for petitioners, Mr. Nababan and his wife, Harlina Salalahi. In this case, Your Honors, the Board abused its discretion in denying their motion to reopen. The starting point is that in Malti v. Ashcroft, the Court specifically held that evidence of continuing violence can constitute changed conditions, even when the same type of violence has occurred before. So under Malti, what evidence is needed to show changed country conditions necessary to permit a motion to reopen? Our position, especially in light of that the Board had held in its previous decision when it denied asylum to the petitioners, that the Indonesian government was improving relations between the religions, is that we need to show documentary evidence of increased violence, intensified attacks against minority groups, decreasing government involvement in protecting those groups, and government participation in persecution. This is the kind of evidence that is needed to show changed conditions, and this is exactly the evidence that we provided. What evidence, counsel, in the continuing violence in Indonesia would show that your clients will be targeted? Yes, Your Honor. Now, if I may just continue a little bit, and I'll tie right back into that, Your Honor. So the evidence that we submitted, Your Honor, rebuts what the Board had said in its prior decision, so therefore we have a change. Now, the government says that there is no change because this kind of violence has happened before. That's really all what their brief shows, and we don't disagree that that is true. Violence against Christians in Indonesia has been ongoing for many years, but that really misses the point, and it's not whether this type of violence has occurred before, but that the new violence is qualitatively different. So our evidence shows that there's an upsurge in radicalism, and that's at Administrative Record 146. In mid-2012, there were double the incidents of violence over the previous years. That's at the Administrative Record 158. The government now fails to protect. That's Administrative Record 140. The government is protecting radical militant groups instead of religious minorities. That's at 172, 143, 132, 137, and now that officials are forcing the destruction of churches rather than just allowing it to happen, and that's at 134 and 143. I think it would be very helpful to go right to that question. Right to that question, okay. Because that's a very, I mean, it's a very specific question, and it's frankly a question which I also would have asked you had Judge Bybee not stolen it. Understood. Okay. Eyes on own papers, please. So if I understand the question, Your Honor, you're looking at particularized risk. What about this petitioner as opposed to all that are similarly situated in Indonesia? Well, he's going to stand out at the forefront. He's returning back from the United States after approximately, what, 15, 16 years of living here. He has three United States citizen children. The children now are at the ages of 12, 10, and 5. These children do not speak Indonesian. So when he returns, he's returning as someone who has not lived in Indonesia for many years, and it's not going to be hard to discern that they're returning from the United States, especially in light of the identification that's required from the government. Counsel, I'll give you a minute to pull all the dots together here, but I just want to tell you that that feels to me like a very different argument. It's an argument that we have heard made in other contexts, that is, that people returning, for example, people going back to Mexico say, well, people coming back to Mexico are persecuted because they are perceived to be wealthier because they were in the United States, or I'm part of a special social group of persons returning to Mexico after having lived someplace else. Well, that's a very different ground from saying I'm being persecuted because I'm a Seventh-Day Adventist. So I thought the religion was what your claim was. This sounds like a very different claim. They're intertwined, Your Honor. The religion and where the fact that he's living in America where it's perceived to be a Christian country, where after this video that went viral in many moderate Muslims and the fanatical Muslims took to the streets to protest against America and Americans. What evidence do you have in the record that shows that people in Indonesia are more likely to persecute Christians returning from the United States to Indonesia after some time abroad? Well, what I do have is this, Your Honor. I have pictures of American flags being burned. I have pictures of signs, America go to hell. I have the American embassy that it shut its door for three days. I have people in the streets yelling epithets to not just Christians but also to Americans. And at this point, because his children are American, that also persecution to them is also persecution to him. And I believe the case for that was Sumalong B. Holder, which was decided just a little while ago. But for him specifically, after he received the letter from his brother who said, look, one of the neighbors who knows that you live in America, who knows that you have United States citizen children, said if your brother is a crazy American, he will be dead here. And that's at administrative record page 55. And I'm going to quote some more. Let these Americans come here. We will show them what happens to people who insult the prophet. And I quote unquote, I will look for your American brother when he comes home. And the letter ends in, I fear that they will get you. So your honor, there is particularized risk to this particular petitioner. Let me go back just a little bit. You talked about Malti. Malti says that changed whether circumstances have changed sufficiently that a petitioner who previously did not have a legitimate claim has now well-founded fear. Right. So we're talking about the word sufficiently. And what is my standard or review on a motion to reopen? It's I'm sorry. I believe it's they have discretion, but now don't they have discretion? So if there's what does that mean to you that a judge has a discretionary standard of review? Well, your honor, I mean, tell me what that means. Well, because I'm going to suggest that that means that there can be evidence in the record that helps you. But if there's sufficient evidence in the record that doesn't help you, I can't undo it even if I could agree with you. Right. So there's a way. And so I look at the record that was prior in front of the, if you will, the immigration services. And I look at the stuff that you have now or the evidence, excuse me for saying stuff, the evidence that you put in front of the immigration services this time. And I'm trying to say, can I say that this record is just so clear that they abused their discretion in saying that it's not a sufficient change? If I compare the two, there's not much difference. So how can I say that they made such a radical decision by saying that it had not sufficiently changed? So your honor, I'm looking at the administrative record on page 194, where the previous order from the board states that the United States Department of State's 2007 Country Reports on Human Rights Practices for Indonesia, dated March 2008, identifies a few sporadic incidents of tension between religious groups, but also indicates that there have been improvements in the relations between religions. The United States Department of State's 2006 International Religious Freedom Report for Indonesia indicates that religious That was the reason where they said that he hadn't met his burden. And they said, well really what you had were incidents of harassment back home, very similar to Melty. But if you take a look at the record now, and I'm going to point to page 158 of the administrative record, and SATARA, the non-governmental organization, recorded 129 incidents of violence and 179 violations of religious freedom from January through June this year. This is now, we're talking about 2012. These numbers are already more than half of last year's total, which had 244 incidents and 299 violations. So these are just, it's more than just a few sporadic incidents of violence. This is now becoming, this is now turning. Were all of these incidents against Christians? Against Christians, Your Honor, yes. And the article's entitled, Intolerance in Indonesia Will Continue to Get Worse. And it came out on May 7, 2012. I may have misspoken. I said these were 2012 numbers. These are 2011 numbers, excuse me. Okay. Counsel, we've taken you over your time. So why don't we hear from the government. I will give you time to respond. Thank you, Your Honor. Good morning, Your Honors. And may it please the Court, Michael Heiss on behalf of the Respondent, the Attorney General of the United States. Does the government really want to take six United States born children who don't speak the language, have nothing to do with the culture? When they're here, they're teenagers, I think most of them are. So they're part of this culture. We're all part of the culture. In other countries, you'll see what the difference is between our culture and some of the And you have two families here that, as far as the record shows, they've been good citizens in a sense. Do we really want to take these people and throw them out of the country with their six American children? Is that what a compassionate country does? The agency has taken a look at these cases. The agency has taken a look at these cases based on the equities Your Honor is describing for some type of prosecutorial discretion. The Department of Homeland Security has twice reviewed Naboban's case and declined to exercise prosecutorial discretion. When was the last time they reviewed it? Last week. What? Last week. Last week? Last week. Why did they wait until last week to look at it? They actually looked at it in December, I think was the final call, December 2015, the first final call. And once the case was scheduled for argument, I took the opportunity to contact them again to make sure. And they followed the Johnson requirements? Yes, Your Honor. The discretion is with the Department of Homeland Security as to whether or not they want to extend prosecutorial discretion to any particular alien. And they have twice taken a look at this case. For what reason, if I might know? Unfortunately, Your Honor, they don't provide a reason to us. They're just arbitrary. I would like to assume they have a reason. They're under no obligation to give me one. Well, you don't assume nothing in this world. That's fair, Your Honor. The DHS is currently reviewing Rabolo's case. That's actually my fault that there's a delay. I contacted DHS back in October on this case. I have a kind of a direct contact with DHS here in Los Angeles, or I had one. He's no longer there. I didn't realize he had left. So there was a miscommunication in the chain there. So they're actually still looking at that right now. What was your sin again? I'm sorry? What was your sin again? My sin? Yeah. I had a direct contact in the chief counsel's office in Los Angeles for ICE. And he is now, I believe, an immigration judge. And I didn't know that. So I sent him an email that didn't bounce back about this case. And in the crush of litigation, that simply fell by the wayside. So you're still pursuing that question? For Rabolo. And if there were to be any change, you would advise the court immediately? Absolutely, Your Honor. And the government would ask the case either be mediated or dismissed or something? Yes, of course. I unfortunately have to assume, based on how similar these two cases are, the result is likely the same. But I can't say one way or the other whether or not it absolutely is. Do you know whether DHS reviewed Rabolo's case previously for an exercise of prosecutorial discretion? As far as I know, they have not. I believe they actively review every case that they receive. Every motion to reopen gets looked at, assuming the request is made to them. Our office will also recommend particular cases for discretion. But ultimately, whether or not they elect to offer that grace to the alien is up to them. They are the prosecutor. You know, when these factors were applied recently, I know I've had several cases where people were turned down. And then there was a lapse of time. They went back again and then granted rapid relief under the Johnson factors. Maybe in half of them that we sent back, cases I was involved in. So what made this change all of a sudden? Honestly, I don't know, Your Honor. Like I said, the discretion is with DHS. So perhaps it's a change in who is making the decision, the actual people involved. It is really up to each office, though, looking at the facts of each case, whether or not they want to exercise the discretion on that particular set of facts. It could be that certain offices, for example, take adverse credibility findings much more seriously in terms of whether or not to grant someone prosecutorial discretion. I've seen that. That is a difference between offices. Here you have individuals that overstayed visas. They had lawful presence and overstayed. Perhaps this office holds that in higher regard as some type of more serious immigration violation. If you've got children born in this country, here you've got six altogether. We don't grant suspension of removal anymore. I don't believe these individuals have asked for cancellation. Suspension is the pre-ERRA form of cancellation of removal. Is it too late? I don't believe they've asked for that here. Is it too late for them to ask for it now? Too late. I believe it is. I'm trying to remember, based on the timing, whether or not they've accrued enough lawful presence because they weren't green card holders, so they'd have to be here for, I believe, 10 years prior to the issuance of a notice to appear. And if I recall correctly, the notices to appear here were about three and four years after their entry into the United States, so they would not. Well, it's been. They came here in December 1999. That was 10 years that way. Right, but the stop time rule under ERRA implemented the stop time rule. The service of the notice to appear cuts off their accrual of presence, not lawful presence, accrual of presence in the United States for purposes of. . . Say that again. I've got my hearing aids turned all the way up. To be eligible for cancellation of removal, an individual has to accrue 10 years of presence. That it's not a lawful permanent resident. It has to accrue 10 years of presence in the United States prior to applying for cancellation of removal. That 10 years, that clock stops as soon as the individual is served with a notice to appear. And so in this case, their clock stopped about, I believe, three and four years, if my math is correct, for each separate petitioner upon the service of the notice to appear in this case. I don't have the statutory cite. Well, they can file another petition today. Not for cancellation of removal. Unchanged country conditions. They could certainly try to file another motion to reopen. What that would show, presumably, is what this court has consistently recognized as a continuation of understandably poor conditions. It's not ideal in Indonesia, but it's not qualitatively different as is required under MOLA. Well, if they can show that conditions today in Indonesia are worse than they were when the last ruling was made, when was that, 2012? If they can show that conditions are worse, then that's a basis for them to move to reopen. They can certainly file another motion to reopen if this court denies this petition for review. If there is evidence they can offer, they are welcome to try to pursue it. What we have here in this court is consistently recognized that, yes, conditions for Indonesian Christians are poor, but they are not qualitatively changing. If anything, they are continuing to improve. These are isolated incidents of, obviously, understandably unfortunate. Well, you know this is a big country. Yes, it is, Your Honor. Almost as many people live there as live in the United States. That's correct. I believe 230 million. What? I believe it's 230 million people in Indonesia. Out of the 230 million, about 90% of them follow the Muslim faith. That's correct, Your Honor. And the percentage of Christians is, what is that offhand, 8%? I believe 10%. 10%? I think it's 23 million Christians, roughly. Counsel, what do you want us to do with the Robowo case? Would you like this court to withhold its disposition until you want to advise us on the exercise or not of prosecutorial discretion? I believe DHS is actively reviewing it right now. It should have an answer from them within, I would imagine, a couple of weeks at most, so if the court could await a response from me on that. But otherwise, the agency properly exercises its discretion in both of these cases. One question I did want to address. Your Honors, we're asking about individualized risk. You're talking about the other case now. Both cases. The cases are substantially identical, and the question is whether or not each one can demonstrate some kind of individualized risk. The risk that counsel offered is itself qualitatively different than his religious-based claim, that it's based on being a westernized Indonesian. That is a completely different group. The individualized risk analysis stems from the conclusion that there is a disfavored group. This requires the conclusion that there is now a disfavored group of westernized individuals living in Indonesia. That's a totally separate inquiry. But ultimately, the question is whether or not the conditions are qualitatively different. That is under Malti. This court most recently in Ringo v. Lynch, so recent it only has a Westlaw site. That's 2016 Westlaw 828301. Nearly identical case to both of these, and while the court acknowledged that conditions are not ideal, they are simply not qualitatively different. Was that citation you just gave us, is that in your brief? It's not. It's a case I found last night, Your Honor. Why don't you provide us with the 28-J? Or you can provide it to the clerk on a scratch sheet as long as you provide it to counsel as well. Yes. Gladly, Your Honor. Ultimately, the board exercised its discretion here, reviewed the case, reviewed all of the evidence. There's no suggestion that they overlooked any evidence. And as Your Honor noted, the question is whether or not the facts are qualitatively different now, whether or not the situation has completely, not completely changed, but is adequately different to demonstrate what was previously a failing case is now a successful case.  Thank you, counsel. Mr. Hagigi, I'll give you time for a response. Yes, Your Honor. Thank you. You know, it always seems to be the response of the government that things in Indonesia are bad. They've always been bad, and that's just the way it is, and that's how it's going to be, and petitioners are not going to be able to meet their burden. But when you take a look over time, you can't say that the situation in Indonesia is improving. In fact, it's going the other way. It is deteriorating and deteriorating to a point where people like Mr. Nababan or people like Mr. Ribowo who are returning to Indonesia will be singled out. In fact, counsel brought up the point of disfavored group analysis. They are, both Nababan and Ribowo, have been deemed to be part of a disfavored group as being Christian in Indonesia under Tambubulan V. Holder. So what they need to show, or the risk that they need to show, is diminished by the fact that they are part of this disfavored group. And, Your Honor, just to highlight, and this is for Judge Parkinson. They have a letter in here from a former neighbor. Yes, Your Honor. It talks about, well, they come back, we're going to kill them. Yes, so there's a standing death threat. Yes, there's a standing death threat against them. That's correct. That's correct, Your Honor. And just, you know, since we're talking about equities and we're talking about the lack of government follow through on their own memo from the Secretary of the DHS, you know, Mr. Nababan is a LDN. He helps at the hospitals. His wife is a registered nurse. They're doing nothing but good in the United States. These are people that are part of our culture. These are people that are trying just to make a better life and not go back to a place where they will be discriminated against or will be killed. And Mr. Ribobo's three children are, he writes to me, he says that his oldest has been a bright student who has always had straight A's and enrolled in honor roll and GATE programs. His middle child is a bright student, straight A's, and has received multiple awards such as Student of the Month, Principal Award, and Excellent Reader Award. She's also in the GATE program. And his youngest, Meredith, who's also a U.S. citizen, has also received awards as Student of the Month. And he himself is a deacon at the church. He himself uses his time in the music ministry and also in helping mentoring the young. And he currently works as a mental health worker in the emergency department in Redlands Community Hospital, and his wife is a CNA in the Magnolia Rehab and Nursing Skills Center. So it baffles me why the government would not exercise discretion in cases such as these. But, Counselor, you're obviously pretty smart on this stuff, and you know that we don't have any right to make the government exercise its discretion. No, but you do have. All we have a right to do is look at this case, and we can prod, we can encourage, and you've had one of the better encouragers sitting right here trying to do it. Yeah, but I don't get too many people to listen to me. Trying to do the encouragement, and you've heard that. After that, if that can't happen, and it seems to me that you've submitted these same facts to the BIA and to the IJ, and all they have to have is some substantial evidence in the record to sustain what they're doing. And we have an abuse of discretion standard of review, as you've told us. That doesn't mean that this court can make those decisions. That means this court has to look at the evidence and determine if there's evidence to sustain what the underlying court did. Now, I was a DJ once, and I like my decisions sustained. And so when I was in that situation, I laid out the evidence which would sustain it. And if that evidence was there, it didn't matter what the Ninth Circuit wanted to do. They were stuck because I had substantial evidence. And the problem is here that we're stuck with the same thing. I mean, Judge Pregerson is a wonderful person, and he's laying out the best he can the equities of this situation. But I'm trying to make you, and I hope you understand because you're pretty smart at this, this isn't your first time to the well, it isn't the first time you've ever been involved, that we have standards of review also that we must sustain. And that if we can't go around those standards or we throw the whole thing out, and then it's just a matter of who you appear in front of. You appear in front of a hard noser, you lose. You appear in front of an easy guy, you don't. Do you understand that? I do, Your Honor. I do. That's all I wanted to say. I think there was an abuse of discretion on the part of the government all the way along the line here. Maybe we have too big a problem with too many people here, not enough compassion in Washington. And we're just hurting ourselves. We're just hurting ourselves. As you look upon these six kids, they're all assets. They're born here. How do we take children who were born here, who were raised here, who are part of our culture, who are doing well, and we, in a sense, throw them out of the country because their parents didn't satisfy the requirement of showing that there was a sufficient risk of danger to their lives. It's common sense to me that if you're going to send them back to an environment like they're going to go back to, you can just read the newspapers and see what's going on in the world and all the hatred that's out there and all the wanton killings. That's where we are. And I think it's very sad and makes you want to cry. You got my vote. I think we understand your position. Thank you very much. Thank you. Thank both counsel for the argument. The two cases are—
judges: Pregerson, Bybee, N.R. Smith